IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEFF POFF,

                                                    OPINION AND ORDER

                    Plaintiff,

                                                    18-cv-563-bbc

          v.

JOLINDA WATERMAN, SANDRA MCARDLE,
DR. SALAM SYED, JESSE BEAVER, TIM DETERS,
JAIME GOHDE, DENISE VALERIUS, LAURA WOOD,
JAMIE STROEDE, TRISHA ANDERSON, ANGELICA
ROWIN FOX and CANDACE WARNER,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          Pro se plaintiff Jeff Poff is proceeding on an Eighth Amendment claim that staff at the

Wisconsin Secure Program Facility and the Columbia Correctional Institution failed to

provide him adequate medical care for his injured knee. Before the court are the motions

for summary judgment filed by plaintiff, dkt. #107; defendant Tim Deters, dkt. #100 (for

plaintiff's failure to exhaust administrative remedies) and dkt #146 (merits of plaintiff's

claim); defendant Jamie Stroede, dkt. #136; defendant Sandra McArdle, dkt. #141; and

defendants Candace Warner, Angelica Rowin Fox, Trisha Anderson, Laura Wood, Denise

Valerius, Jamie Gohde, Jesse Beaver, Salem Syed and Jolinda Waterman (the state

defendants), dkt. #151.

          Also before the court are three motions filed by various parties after completion of

the briefing on the motions for summary judgment. Dkt. ##174, 180 and 188. First, on

November 1, 2019, plaintiff moved to dismiss the motions for summary judgment filed by

defendants Deters and McArdle. Dkt. #174. Although the motion is confusing, I understand plaintiff to be arguing that these defendants are not entitled to summary judgment simply because plaintiff had not yet filed a response to their proposed findings of fact. Plaintiff points out that the court extended his response deadline to November 12, 2019. Dkt. #179. Because plaintiff filed his responses to defendants' proposed findings of fact within that deadline, dkt. ##175 and 177, there is no basis for plaintiff's concerns. Therefore, his motion to dismiss will be denied as moot.

Second, plaintiff has filed a motion for clarification in which he alleges that his injuries actually occurred during recreation on January 30, 2017, and not on January 31, as he alleges in his complaint. Dkt. #180. Because the state defendants have had the opportunity to respond to plaintiff's clarification in their reply brief and the actual date of plaintiff's injury is not material to plaintiff's claims against any of the defendants, I will grant the motion.

Third, the state defendants filed a motion to supplement the summary judgment record with defendant Valerius's declaration, dkt. #151, which they inadvertently omitted from their initial filings in support of their motion. Dkt. #188. Plaintiff did not respond to the motion. Because the information contained in Valerius's declaration was included in the state defendants' proposed findings of fact, to which plaintiff responded "does not dispute," plaintiff will not suffer any prejudice from the late addition of the declaration to the record. Therefore, I will grant the state defendants' motion to supplement the record.

Finally, for the reasons explained below, I find that plaintiff has failed to show that

any of the defendants acted with deliberate indifference to his serious medical needs. Therefore, the motions for summary judgment filed by defendants will be granted and plaintiff's motion for summary judgment will be denied.

From the parties' proposed findings of fact and the evidence in the record, I find the following facts to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A.  The Parties

Plaintiff Jeff Poff was incarcerated at the Columbia Correctional Institution from April 29, 2016 until August 15, 2017.  He was transferred to the Wisconsin Secure Program Facility on August 16, 2017.  During plaintiff's incarceration at Columbia, defendant Denise Valerius was a nurse clinician, defendant Dr. Salem Syed was a physician, defendant Jamie Gohde was the health services manager and nursing supervisor from July 25, 2016 to May 15, 2017, defendant Candace Warner performed the health services manager duties from May to August 2017 and defendants Tim Deters, Jamie Stroede, Jesse Beaver, Laura Wood, Trisha Anderson and Angelica Rowin Fox were registered nurses.  (Plaintiff has incorrectly referred to defendant Beaver as "Becher" in his filings.)  During plaintiff's incarceration at the Wisconsin Secure Program Facility, defendant Jolinda Waterman was the health services unit manager and nursing supervisor and defendant Sandra McArdle was a nurse practitioner.

B. <u>Background</u>

Inmates must communicate with the health services unit with written interview and information requests and health service requests. The requests document medical care and complaints of symptoms. One of the duties of a nurse clinician is to "triage" health service requests, which means assessing the requests to insure that patients receive appropriate attention with the requisite degree of urgency.

Nurses and nurse clinicians cannot prescribe medications or refer an inmate for an appointment with a Department of Corrections specialist or an outside provider. Only a nurse practitioner or physician can prescribe medications and make referrals. The health services manager provides overall administrative support and direction of the unit, but does not evaluate, diagnose, determine courses of treatment, prescribe medications or have any direct patient care contact with inmates. The health services manager also does not have control over the schedules of physicians or outside specialists.

At Columbia Correctional Institution in 2017, a data management program called Access was used to track prisoners' medical appointments. The program was accessible to all health services unit employees. The nurses are primarily responsible for scheduling any appointments with the nursing staff and in-house physicians. However, any health services staff member with access to the program could add, edit, reschedule or cancel appointments. Once entered, appointments could be accessed by searching the patient's Department of Corrections identification number within the database and then scrolling through the list to view all previous, present and future appointments.

The medical assistant working with the in-house physician has the responsibility of creating a list of 12 to 15 patients whom the physician would see each day. The physician is often unable to see all patients scheduled on a given day, and those patients must be rescheduled. With the exception of the segregation units, which have assigned clinic times each week, patients are not assigned specific appointment times. The physician determines the order in which the patients should be seen.

There are many reasons why an inmate's physician appointment might be changed. Health service requests are triaged daily. If injuries or other emergencies occur, there may be an urgent or emergent need for the doctor to see another patient, and routine appointments may be cancelled. In addition, security situations such as lockdowns, training days and modified movements within the institution may result in patients' not being seen by the physician.

### C. Plaintiff's Treatment at Columbia

1. Defendant Beaver treats plaintiff's initial injury

On January 28, 2017, before plaintiff allegedly suffered an injury while playing basketball on January 30, he submitted a health service request stating, "I'm in a lot of pain." Plaintiff did not identify the source of his pain in the request. (The source of plaintiff's knee pain and the date on which his alleged injury occurred are not material to his claims because defendants do not dispute that plaintiff's knee pain posed a serious medical need.)

On January 31, 2017, plaintiff was taken to the health services unit by wheelchair and

saw defendant Beaver for knee pain. Beaver noted in plaintiff's records that the treatment plan was "ice intermittently, PRN oral analgesic, rest, elevate, MD appointment made to follow-up right knee injury." The same day, plaintiff submitted two health service requests complaining that the nurse (presumably Beaver) did not give him Ibuprofen or any other medical care for his "broken knee" and that he was in extreme pain and needed to see a doctor. A health services staff member responded on February 2, 2017 that plaintiff was scheduled to see a nurse.

2.  Defendants Valerius, Anderson and Gohde respond to plaintiff's February 2017 health service requests

On or around February 4, 2017, plaintiff submitted a health service request about needing crutches and medical care for his knee. Defendant Valerius responded on February 5 that plaintiff had an appointment scheduled with the doctor for the next week and that he should continue to take Naproxen as needed for pain. (It is unclear who gave plaintiff the Naproxen or when it was given to him, but plaintiff had access to the medication until Dr. Syed discontinued it in March 2017.)

On February 7, 2017, plaintiff submitted a health service request stating that his knee was broken and that he needed to go to the hospital. Defendant Anderson responded on February 8 that a sick call was scheduled with a nurse.

On February 12, 2007, plaintiff directed a health services request to defendant Gohde about not seeing a doctor or receiving x-rays and proper care for his knee. Defendant Valerius reviewed the request and forwarded it to Gohde. In response to this request and

another request in which plaintiff complained about his knee and other issues, Gohde told plaintiff that he was scheduled to see the doctor the next week.

Plaintiff saw defendant Nurse Anderson on February 14, 2017 and complained about having a "broken knee" that he could not bend sideways. (This appointment appears to be plaintiff's first visit with a health care provider following his January 31 appointment with Beaver.) Anderson observed that plaintiff's comfort and mobility were impaired, gave him one bottle of Tylenol and noted that no advanced care practitioner referral was necessary because plaintiff already had an appointment scheduled with the doctor. Plaintiff submitted a health services request the next day, complaining that Anderson had not examined his knee or referred him to a doctor. On February 17, 2017, defendant Valerius responded that plaintiff had an appointment scheduled for February 21, 2017. However, plaintiff was not seen by the physician on February 21. (It is not clear from the record why plaintiff was not seen.)

### 3. Dr. Syed treats plaintiff in March 2017

Plaintiff saw Dr. Syed on March 6, 2017, and reported that he injured his right knee while playing basketball a month or so earlier and that his knee sometimes gave out. Dr. Syed observed that plaintiff's right knee was moderately swollen but had a full range of motion with mild discomfort. Plaintiff's vital signs were normal, and he had no clinical indications of extreme pain. If a person is in extreme pain, Dr. Syed would expect vital signs to reflect the body's response to extreme discomfort with increased blood pressure, pulse and

respiration.

Dr. Syed issued several orders, including scheduling plaintiff to see an orthopedic specialist, referring him for physical therapy, issuing him bilateral knee braces, discontinuing Naproxen and prescribing 800 milligrams of Ibuprofen twice daily for six months up to a maximum of 60 tablets per month. The maximum recommended single dose of Ibuprofen is 800 milligrams. Dr. Syed does not have any control over how quickly an inmate can be seen for an off-site visit. It was Dr. Syed's expert medical opinion that plaintiff did not need an x-ray, magnetic resonance imaging study or a follow-up appointment with him, because Dr. Syed thought that six months is an acceptable amount of time to attempt conservative methods—such as physical therapy, NSAIDs (nonsteroidal anti-inflammatory drugs), ice and knee braces—for resolving a knee condition like plaintiff's before considering a magnetic resonance imaging study and surgery. (Plaintiff says that six months was too long and that he did have x-rays scheduled for his knee, but he fails to present any evidence in support of his contentions apart from his own lay opinion.)

4. <u>March, April and May 2017 health service requests</u>

On March 5, 2017, plaintiff wrote a health services request complaining that Tylenol and Alleve were not working. A non-defendant nurse responded on March 7 that plaintiff had been seen by the doctor on March 6. Plaintiff wrote another health service request on March 7, asking when he would be scheduled for physical therapy. A non-defendant nurse responded on March 8 that physical therapy sets its own schedule and would be calling him.

On March 11, 2017, plaintiff wrote a health service request stating that he had not received the treatment, medication and supplies ordered by Dr. Syed and that he was in extreme pain. Defendant Deters responded on March 14 that plaintiff had been referred to an orthopedist and physical therapy, but no appointments had been set. On March 19, 2017, plaintiff wrote another health service request stating that it had been two weeks since his appointment with Dr. Syed and that he had not yet been seen by another provider. Deters responded on March 24 that plaintiff had been referred to physical therapy and was waiting on available appointments with both the physical therapist and the orthopedist. Plaintiff was evaluated for physical therapy on April 12, 2017.

Plaintiff filed health service requests in late April and early May 2017 about needing x-rays, outside medical attention and surgery for his knee. Defendant Warner responded promptly, telling plaintiff that he was on the schedule to see an orthopedic specialist within the month. Plaintiff filed another health service request on May 29, 2017 and was told that he had an upcoming orthopedic appointment.

5. May 31, 2017 orthopedic appointment and resulting treatment

On May 31, 2017, plaintiff saw Dr. Grossman, an orthopedist at Waupun Memorial Hospital. Dr. Grossman noted that plaintiff's right knee came to full extension and flexed past 90 degrees, plaintiff had some medial joint line tenderness and plaintiff's x-rays showed a subtle decrease in medial joint space but were otherwise unremarkable. Dr. Grossman ordered a hinged knee brace and a magnetic resonance imaging study of the right knee but

no additional medications, creams or other treatment.  On June 1, 2017, Dr. Syed completed a referral form for a magnetic resonance imaging study.

6.  June to August 2017

Plaintiff did not have a medical diagnosis for his knee in June 2017.  However, between June and August 2017, he was allowed up to 1600 milligrams of Ibuprofen a day as needed for pain.  Plaintiff's medication and treatment record form for the month of June 2017 shows that he refused the pain medication during 17 morning rounds and six evening rounds.  Nevertheless, plaintiff continued to submit health service requests after seeing Dr. Grossman.

On June 6, 2017, plaintiff submitted a health service request asking to see a doctor for pain medication because he was in a lot of pain.  On June 8, defendant Wood referred the request to the provider for review, and a second note on the request states that "patient can be scheduled."  On June 12, Dr. Syed saw plaintiff for a skin rash and orthopedic shoes. He ordered triamcinolone cream for a skin rash and a fitting for orthopedic shoes.  Dr. Syed also noted that there was a pending order for a magnetic resonance imaging study at the University of Wisconsin Radiology Department.  There is no notation regarding any complaints of pain in that record.

On June 16, 2017, plaintiff submitted a health service request asking when his magnetic resonance imaging study would occur.  Defendant Valerius responded that it was scheduled and coming up fairly soon.

On June 24, 2017, plaintiff submitted a health service request complaining that he had knee pain and needed medications and orthotic shoes. Defendant Valerius responded that plaintiff had refused an appointment he had scheduled on June 21, 2017, but that the appointment would be rescheduled. (Although there is evidence that defendants Wood, Valerius and Anderson also responded to several health service requests that plaintiff submitted in June and early July 2017 about "no floor" and "low bunk" restrictions and orthotic shoes, I have not considered these requests because they did not relate to plaintiff's knee pain and plaintiff was not allowed to proceed on any claim related to restrictions or shoes.)

Plaintiff received a magnetic resonance imaging study on July 13, 2017. It showed a tear of the posterior horn of the medical meniscus, cartilage degeneration and moderate joint effusion but no fracture or dislocation of the knee and an intact knee joint. The same day, plaintiff submitted a health service request asking to be seen as soon as possible for more medication and orthopedic shoes. Defendant Anderson responded that plaintiff would be scheduled to see the doctor.

On July 24, 2017, plaintiff saw Dr. Syed, who ordered an orthopedic appointment for plaintiff. Plaintiff submitted a health service requests on July 29, 2017, complaining that it had been two weeks since his imaging study and that he did not yet have an appointment for his special shoes. Defendant Deters responded that it would take longer than two weeks to get an orthopedic appointment because the imaging report had not yet been received. Plaintiff submitted a similar request on August 8, and Deters responded that the

11

appointment had been scheduled.

Plaintiff left a health services unit appointment on August 11, 2017 because he could not have the medications that he wanted. Plaintiff was seen for knee pain again on August 15, 2017, and the medical note states that there was no alteration in plaintiff's gait or abnormal vital signs, despite his claim that he rated his pain as an eight out of 10. He was given 800 milligrams of Ibuprofen (as previously ordered) and ice.

### C. Plaintiff's Treatment at Wisconsin Secure Program Facility

1. Wait for orthopedic evaluation and knee surgery

After transferring to the Wisconsin Secure Program Facility on August 16, 2017, plaintiff saw defendant McArdle on August 24. McArdle noted that plaintiff was anxious to have surgery for what he was claiming was an ACL tear, but that plaintiff actually had a tear to the medial meniscus. Her examination of plaintiff's right knee revealed a small open wound but no increased warmth or swelling. McArdle provided plaintiff ice, prescribed 800 milligrams of Ibuprofen and made a referral to an orthopedic physician. (Although plaintiff says that surgery was supposed to be scheduled as of this date, he has not presented any evidence in support of his contention, and there is no recommendation for surgery in his medical record as of August 24.)

On September 27, 2017, Nurse Drone (not a defendant) told plaintiff that he was scheduled to see Dr. Edward Riley, the only orthopedic surgeon in Boscobel who will see inmates. On November 8, 2017, plaintiff submitted a health service request complaining

of pain and lack of treatment and asking for an appointment as soon as possible. A non-defendant health service staff member responded that plaintiff had an upcoming orthopedic appointment, should continue Ibuprofen and his physical therapy exercises and would be provided a recreation restriction. Defendant McArdle issued plaintiff a recreation restriction for no running or playing basketball during recreation. On November 12 or 13, 2017, plaintiff asked to be taken off the restriction, stating that he did not exercise his knee. McArdle amended the restriction to state that plaintiff could walk but not run or play basketball.

On November 20, 2017, plaintiff submitted a health service request complaining that he was being denied surgery, he needed treatment and the Ibuprofen was causing him severe stomach pain. A nurse responded that he should take his medication with food and forwarded the request to defendant McArdle, who saw plaintiff on November 21. McArdle noted that plaintiff had an upcoming orthopedic appointment, gave him capsaicin cream and Votaren gel for his knee pain and provided ranitidine, miralax, and docusate for stomach problems he was having with the Ibuprofen.

On December 8, 2017, plaintiff saw Dr. Riley, who noted that plaintiff's knee was stable with a full range of motion. Dr. Riley recommended quadriceps exercises and noted that an arthroscopy should help, but he stated that surgery would not give plaintiff a knee that enabled him to do all of the sports he wanted to do. Neither Dr. Riley nor any other provided recommended that plaintiff have surgery as soon as possible. (Plaintiff attempts to dispute this by saying that "surgery was to be already scheduled," but he has not provided any

further information about who had ordered that surgery or when it was ordered.)

Plaintiff was prescribed Tramadol for pain relief in December 2017. Defendant McArdle completed an "Offsite Service Request and Report" form for the surgery to take place at Gunderson Boscobel. The same day, prescribing nurse practitioner Clarson ordered Tramadol for plaintiff's knee pain. On December 27, 2017, plaintiff submitted a health service request, asking to be seen for a medication change for his knee pain and stomach problems. Defendant Anderson responded to the request, noting that plaintiff was scheduled to see Clarson. On December 29, plaintiff refused the appointment with Clarson.

On January 3, 2018, plaintiff submitted a health service request complaining that his pain medication had been discontinued. Defendant Anderson responded that plaintiff was receiving Tramadol for pain. On January 4, another nurse advised Clarson that plaintiff was holding his medication under his tongue instead of swallowing it. (Plaintiff says that he was not provided water to swallow the medication.) On January 5, Clarson ordered that the Tramadol be crushed for administration.

On January 15, 2018, a nurse alerted Dr. Syed that plaintiff had attempted to switch the medication cups in a second attempt to avoid taking Tramadol. Dr. Syed discontinued the Tramadol because of plaintiff's misuse of it. On January 17, 2018, plaintiff saw Nurse Tracy (not a defendant) and stated that he was having side effects from Tramadol withdrawal. Tracy told plaintiff that Tramadol was not a narcotic medication and would not cause withdrawal symptoms and that Tramadol had been discontinued for him because he was not using it appropriately.

On January 22, 2018, defendant Anderson saw plaintiff regarding knee pain, but plaintiff wanted only an advanced care provider. Anderson provided ice and scheduled plaintiff an appointment with defendant McArdle. She also noted plaintiff "ambulated without difficulty."

On January 24, 2018, plaintiff saw defendant McArdle and requested additional medication for knee pain. She noted that he already had "APAP" (acetaminophen), NSAIDs, capsaicin cream and voltaren gel for pain and explained that the state had changed guidelines about avoiding controlled (narcotic) medications for chronic musculoskeletal pain. McArdle offered plaintiff a different NSAID and gave him diphenhydramine. In response to plaintiff's January 30 health service request about needing medical attention, Nurse Drone responded on January 31 that a provider could be hesitant to provide stronger medications because of plaintiff's mishandling of past medications. She forwarded the request to McArdle, who recommended that plaintiff give NSAIDs and diphenhydramine a chance to work. McArdle also provided ice to plaintiff to help his pain.

On February 13, 2018, plaintiff saw defendant McArdle to schedule his surgery and address his knee pain, chronic headaches and constipation. McArdle entered orders for plaintiff to be measured for a right knee splint and to see neurology for his headaches. On March 4, defendant Waterman received a health service request from plaintiff regarding his request for a new knee brace. She responded on March 5, that the brace had been ordered and would arrive soon.

On March 5, 2018, McArdle cleared plaintiff medically for surgery. According to

defendant Waterman, a three-month wait for surgery requiring both surgeon and hospital availability is consistent with community standards.

2. Surgery and post-operative treatment

Plaintiff had arthroscopic surgery on March 9, 2018 and was discharged the same day. Upon discharge, plaintiff was not prescribed any new medication in addition to a combination dose of aspirin, acetaminophen and caffeine; the capsaicin cream; and the Voltaren gel that he already was using. Following the surgery, defendant McArdle prescribed Tramadol and Tylenol for pain.

On March 11, plaintiff submitted two health service requests stating that he had received oxycontin during surgery and that he needed more for pain. McArdle responded that the surgeon did *not* want plaintiff to have any controlled medications and told plaintiff that he did not have to take the Tramadol if he did not want to. McArdle saw plaintiff on March 12 for pre-op history and a physical for his upcoming colonoscopy and endoscopy. On March 13, she examined plaintiff's knee, cleaned and redressed the incision area and advised plaintiff to elevate his leg.

On March 15, 2018, Dr. Patterson (not a defendant) ordered Tramadol (crushed), elevation, ice and suture removal. On March 16, defendant McArdle ordered APAP and ondansetron (for vomiting). On March 18, plaintiff submitted a health service request stating that he was in severe pain. The next day, plaintiff saw Dr. Patterson, who sent plaintiff to the emergency room to rule out a blood clot. On March 20, Dr. Patterson re-evaluated

plaintiff's knee and ordered additional crushed Tramadol until plaintiff had his follow-up appointment with Dr. Riley on March 23. At that appointment, Dr. Riley aspirated joint fluid (with no blood present) from plaintiff's knee and noted that he was healing well with no infection. (Plaintiff says his right knee was infected because it needed to be drained, but he has failed to explain why he believed this to be true and has not presented any evidence apart from his own lay opinion to support his contention.) A follow-up appointment was set for the next month.

On March 24, 26 and 27, 2018, plaintiff submitted multiple health service requests demanding another imaging study for his right knee, alleging that Dr. Riley "messed up" during surgery and that he was in extreme pain. Defendant McArdle responded that plaintiff could discuss his concerns with Dr. Riley at his upcoming appointment and that plaintiff could see Dr. Patterson for knee pain. On March 28, Dr. Patterson noted that the wound looked good and ordered ice, elevation, no strenuous activity and Ibuprofen and Tylenol for pain. (Plaintiff says that Dr. Riley told him he did not want plaintiff on Ibuprofen or Tylenol. However, Dr. Riley's alleged statement to plaintiff is inadmissible hearsay because plaintiff is attempting to rely on an unsworn statement made outside of court to prove that he should have received medications other than Ibuprofen and Tylenol after his surgery. Therefore, I cannot consider Dr. Riley's alleged statement. Burton v. Kohn Law Firm, S.C., 934 F.3d 572, 583 (7th Cir. 2019) (hearsay statements are not admissible evidence at summary judgment).)

## OPINION

Plaintiff's medical care claims are governed by the Eighth Amendment. A prison official may violate this right if the official is "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). See also Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care."). At least for purposes of summary judgment, defendants concede that plaintiff's knee condition posed a serious medical need. Therefore, the question is whether plaintiff has submitted enough evidence from which a reasonable jury could conclude that any of the defendants acted with "deliberate indifference" toward his serious medical need. Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012).

"Deliberate indifference" means that the officials were aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). To be considered "deliberately indifferent," an official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Snipes v. Detella, 95 F.3d 586, 590 (7th Cir. 1996). Inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996).

In cases like this one, in which a prisoner alleges that he received some treatment for his medical condition, but contends that the treatment was inadequate, the relevant question is whether the medical provider's actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996). In such cases, courts must defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014). A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Id. But a medical provider may violate the Eighth Amendment if the provider prescribes a course of treatment without exercising medical judgment or one that the provider knows will be ineffective. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662-63 (7th Cir. 2016).

Evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment, the defendant's persistence in "a course of treatment known to be ineffective" or proof that the defendant's treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment. Whiting, 839 F.3d at 662-63. A medical professional's choice to pursue an "easier and less efficacious treatment" or "a non-trivial delay in treating serious pain" may also support a claim of

deliberate indifference. <u>Berry v. Peterman</u>, 604 F.3d 435, 441 (7th Cir. 2010) (citation omitted).

Finally, a medical provider cannot be held liable for deliberate indifference under 42 U.S.C. § 1983 unless the provider was personally involved with the prisoner's medical care or treatment. <u>Gayton v. McCoy</u>, 593 F.3d 610, 612 (7th Cir. 2010) (granting summary judgment for defendants who did not know about plaintiff's condition or requests for medical attention); <u>Aponte v. Suliene</u>, Case No. 14-cv-132-jdp, 2016 U.S. Dist. LEXIS 116843, at *20- 21 (W.D. Wis. Aug. 30, 2016) (granting defendant's motion for summary judgment because defendant was not personally involved in scheduling or allegedly depriving the plaintiff of an earlier off-site appointment for staple removal).

I will discuss defendants' alleged actions separately.


A. <u>Defendant Beaver</u>

Plaintiff contends that defendant Beaver failed to provide him any form of medical care or treatment when he saw her for his knee injury on January 31, 2017. However, it is undisputed that Beaver ordered ice, rest, elevation and an oral analgesic and referred plaintiff for an appointment with the doctor. It also is undisputed that as a nurse, Beaver, could not prescribe medications or refer plaintiff to a specialist or outside provider. Although plaintiff apparently believes that Beaver should have given him Ibuprofen and some other less conservative form of medical treatment, he has submitted no evidence from which a reasonable jury could conclude that Beaver failed to use medical judgment or knew that the

conservative measures she took would be ineffective.  Plaintiff has also failed to show that no competent medical provider would have attempted the same conservative treatment measures so soon after plaintiff's injury occurred.  In fact, Dr. Syed has stated the uncontroverted medical opinion that as long as six months is an acceptable amount of time to attempt conservative methods for resolving a knee condition like plaintiff's before ordering a magnetic resonance imaging or a referral to a specialist.  Accordingly, defendant Beaver is entitled to summary judgment on plaintiff's Eighth Amendment claim.

## B.  Defendant Dr. Syed

Plaintiff objects to the relatively conservative treatment that he received from Dr. Syed in March 2017 and June 2017, stating that Dr. Syed treated him only with Tylenol. Contrary to plaintiff's assertion, Dr. Syed did not choose to treat plaintiff's pain only with Tylenol.  In addition, plaintiff has failed to present any evidence apart from his own lay opinion to show that defendant Dr. Syed's decision to rely on conservative measures and non-narcotic pain medication was a substantial departure from accepted professional judgment, practice or standard.

On March 6, Dr. Syed observed that plaintiff's right knee was moderately swollen and had a full range of motion with only mild discomfort and that plaintiff had no clinical indications of extreme pain.  He referred plaintiff to an orthopedic specialist and physical therapy, issued him bilateral knee braces and prescribed 800 milligrams of Ibuprofen twice daily for six months up to 60 tablets a month.  Although plaintiff suggests that Dr. Syed

should have ordered an alternate pain medication, the undisputed facts show that Dr. Syed based his decision to prescribe plaintiff the maximum dose of Ibuprofen on his medical judgment that the medication would be effective for plaintiff's pain. Medical staff have considerable discretion under the Eighth Amendment in choosing appropriate treatment, particularly with respect to pain medication, which requires medical staff to consider not just a patient's complaints of pain, but security and addiction concerns as well. Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) ("Using [pain killers] entails risks that doctors must consider in light of the benefits. . . . Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."). In this case, plaintiff has failed to adduce any evidence to show that Dr. Syed's decision to prescribe the maximum dose of Ibuprofen was "blatantly inappropriate" or obviously unreasonable. Id.

It also was Dr. Syed's expert medical opinion that plaintiff did not need an x-ray, magnetic resonance imaging study or a follow-up appointment with him. Although plaintiff had to wait until May 31 to see the orthopedist, he has produced no evidence suggesting that Dr. Syed was responsible for the delay. In fact, it is undisputed that Dr. Syed and the other health services staff do not have control over the schedules of outside specialists.

Dr. Syed saw plaintiff again on June 12, 2017 and did not prescribe plaintiff any different pain medication at that time. Although it is undisputed that plaintiff asked about pain medication in a June 6 health services request, plaintiff fails to present any evidence about what he discussed, if anything, about his pain or his need for pain medication with Dr.

Syed on June 12. In addition, less than two weeks before this appointment, plaintiff had seen an orthopedic specialist who did not prescribe any additional or different pain medication.

In sum, although plaintiff may not agree with Dr. Syed's treatment decisions and may have hoped for a different medication and more tests, plaintiff's lay opinion to that effect is not enough to prove his claim that Dr. Syed acted with deliberate indifference to his pain. Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010). Accordingly, defendant Dr. Syed is entitled to summary judgment.

## C. Defendant Deters

Plaintiff alleges that defendant Deters failed to help him at Columbia Correctional Institution in March 2017, when plaintiff complained that he was in pain without medication and needed to see a physical therapist and orthopedist for his knee. In particular, plaintiff alleges that Deters responded to his health service requests by stating that although the referrals had been made, no appointments had been scheduled for plaintiff at that point. Defendant Deters argues that plaintiff's claim fails because plaintiff: (1) failed to exhaust his administrative remedies with respect to his claim against Deters; and (2) plaintiff cannot show that Deters acted with deliberate indifference in responding to plaintiff's request for help.

### 1. Exhaustion

Under the Prison Litigation Reform Act, prisoners must exhaust all available

administrative remedies before filing a lawsuit in federal court about prison conditions. 42 U.S.C. § 1997e(a). To comply with 1997e(a), a prisoner must take each step within the administrative process, Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002), which includes following instructions for filing an initial grievance, Cannon v. Washington, 418 F.3d 714, 718 (7th Cir. 2005), as well as filing all necessary appeals, Burrell v. Powers, 431 F.3d 282, 284-85 (7th Cir. 2005), "in the place, and at the time, the prison's administrative rules require." Pozo, 286 F.3d at 1025. To exhaust administrative remedies in Wisconsin, inmates must follow the inmate complaint review process set forth in the Wisconsin Administrative Code ch. DOC 310. The purpose of these requirements is to give the prison administrators a fair opportunity to resolve the grievance without litigation. Woodford v. Ngo, 548 U.S. 81, 88-89 (2006). Failure to exhaust administrative remedies under § 1997e(a) is an affirmative defense that must be proven by the defendants. Davis v. Mason, 881 F.3d 982, 985 (7th Cir. 2018).

Defendant Deters has presented evidence showing that plaintiff did not file an inmate complaint about being in pain and not receiving treatment in March 2017. Dkt. #102-1 at 10 (plaintiff's inmate complaint history report). However, on February 14, 2017, plaintiff filed an inmate complaint (no. CCI-2017-4746) in which he stated that he had been charged a medical co-payment on January 31, 2017 but had failed to receive a full assessment, x-rays, a referral to a physician or any other treatment, even though he had twisted his knee and was in "extreme" pain. Dkt. #102-2 at 6. Although this inmate complaint predates the March 2017 incident and does not specifically address Deters's alleged failure to treat plaintiff's pain

24

or make an appointment with the physical therapist or orthopedist, his claim against Deters is related to his February 2017 complaint about not getting treatment or a physician referral for his knee injury. The Court of Appeals for the Seventh Circuit has held that "[i]n order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." Turley v. Rednour, 729 F.3d 645, 650 (7th Cir. 2013). Once plaintiff had fully exhausted one inmate complaint regarding his failure to receive treatment or a referral for his knee injury, he was not required to submit a new complaint each time health services staff failed to provide him adequate treatment for the same problem. Therefore, I find that plaintiff has exhausted his administrative remedies as to his claims against Deters and will deny Deters's motion for summary judgment on this ground.

2. Deliberate indifference

Although plaintiff generally contends that defendant Deters should have done more to help him in March 2017, after he complained about not having received the referrals, medication and supplies ordered by Dr. Syed, he has failed to present any evidence to support his claim or explain what happened. The undisputed facts show that Deters responded to plaintiff's request by explaining that the referrals had been made but the appointments were not yet scheduled with the specialists. Although plaintiff had to wait another one to two months before seeing the physical therapist on April 12 and the orthopedist on May 31, plaintiff has not presented any evidence showing that Deters was responsible for setting the

appointments or did anything to delay the scheduling of them.

Plaintiff also has not presented any evidence regarding his access to pain medication or supplies at the time he filed his health service requests in March 2017. It is undisputed that Dr. Syed had increased his Ibuprofen dosage to 800 milligrams twice daily. Although plaintiff's health service requests suggest that he did not receive the Ibuprofen or medical supplies right away, he has failed to explain in any of his summary judgment filings how long he was without these items, how the lack of these items affected him or when he finally received them. Without more information to support plaintiff's vague accusations, no reasonable jury could conclude that Deters acted with deliberate indifference to plaintiff's serious medical needs. Therefore, defendant Deters's motion for summary judgment with respect to plaintiff's claim against him will be granted.


D. Defendants Valerius, Anderson, Wood, Fox, Gohde and Warner

Plaintiff's claims against nurses Valerius, Anderson and Wood and health services managers Gohde and Warner seem to be based on what he believes to be their inadequate responses to his health service requests related to knee pain and scheduling an appointment with a doctor at Columbia Correctional Institution. However, plaintiff has failed to present any evidence from which a reasonable jury could conclude that any of these defendants acted with deliberate indifference. (Plaintiff does not mention defendant Fox in any of his summary judgment materials so I assume that he has abandoned his claims against her.)

1. February 2017

Plaintiff submitted numerous health service requests at Columbia in February 2017 about wanting to see a doctor, but the undisputed facts show that defendants Valerius, Anderson and Gohde responded promptly to all of them, informing plaintiff that he had an appointment scheduled. Although plaintiff had to wait a little over a month to see a doctor after he injured his knee in late January 2017, plaintiff has not produced any evidence suggesting that Valerius, Anderson or Gohde was responsible for the delay. It is undisputed that more urgent cases may take precedence over regularly scheduled appointments, and plaintiff has not produced any evidence to show that his condition was so urgent that it required immediate attention. Plaintiff also has not submitted any evidence clearly showing that any delay exacerbated his injury or prolonged his pain. Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").

As for plaintiff's complaints about being in pain during this period, the undisputed facts show that defendant Beaver had ordered ice and an oral analgesic, plaintiff had access to Naproxen and Anderson gave plaintiff a bottle of Tylenol on February 14. There is no evidence that Valerius, Anderson or Gohde knew that treating plaintiff with analgesics, Naproxen and Tylenol would pose an excessive risk of harm by unnecessarily prolonging plaintiff's pain or exacerbating his injury or that they could have done more for plaintiff's pain while he waited to see the doctor.

## 2. April and May 2017

After plaintiff saw Dr. Syed in March 2017, he filed health service requests in late April and early May 2017 about needing x-rays, outside medical attention and surgery for his knee. Defendant Warner responded promptly, telling plaintiff that he was on the schedule to see an orthopedic specialist within the month. It is undisputed that Warner had no control over the schedules of outside specialists and did not have the authority to prescribe medication, order tests or overrule the treatment plan put in place by Dr. Syed, who had decided x-rays were not necessary. Miller v. Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012) ("[D]efendants cannot be [held liable under the Eighth Amendment] if the remedial step was not within their power."). Plaintiff also has failed to point to any evidence showing both that Dr. Syed's treatment plan of using conservative measures for six months would pose plaintiff an excessive risk of harm by unnecessarily prolonging his pain or exacerbating his injury and that defendant Warner knew this. Pyles, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances."); Berry, 604 F.3d at 443 ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient.").

## 3. June and July 2017

After plaintiff saw the orthopedist on May 31, 2017, he continued to submit health

service requests about needing pain medication and immediate surgery. However, the undisputed evidence shows that defendants Wood and Valerius responded promptly to plaintiff's requests, and plaintiff has not submitted any evidence showing that they were responsible for any delay in his receipt of tests or other care. In response to a June 6 request to see a doctor for pain medication, defendant Wood referred the request to the provider for review, which resulted in plaintiff's seeing Dr. Syed on June 12. Defendant Valerius also responded to plaintiff's June 16 request about needing a magnetic resonance imaging study, telling him that the imaging study had already been scheduled. (The imaging study took place less than a month later, on July 13.) Although plaintiff complained that he needed pain medication on June 24, 2017, Valerius responded that plaintiff had refused an appointment on June 21 and that he would be scheduled for another appointment. Further, it is undisputed that plaintiff had access to 800 milligrams of Ibuprofen twice daily in June 2017 but refused the pain medication during 17 morning rounds and six evening rounds that month.

In light of the evidence in the record, no reasonable jury could conclude that defendants Valerius, Anderson, Wood, Fox, Gohde and Warner acted with deliberate indifference to plaintiff's serious medical needs. Accordingly, these defendants are entitled to summary judgment with respect to plaintiff's claims against them.


E. Defendant Stroede

Plaintiff alleges that defendant Stroede failed to provide him pain medication when

he requested it in June 2017. However, plaintiff has not presented any evidence about his alleged communications with Stroede or her alleged responses. In fact, it is undisputed that there is no record of plaintiff's seeing Stroede for any reason in June 2017. Although plaintiff submitted health service requests that month related to pain medication, defendants Wood and Valerius, and not Stroede, responded to them. Because no reasonable jury could conclude that defendant Stroede acted with deliberate indifference to plaintiff's serious medical needs, her motion for summary judgment will be granted.

## F. Defendant McArdle

Defendant McArdle evaluated plaintiff on August 24, 2017, shortly after his transfer to the Wisconsin Secure Program Facility. At that time, she provided him ice, continued him on 800 milligrams of Ibuprofen and made a referral to an orthopedic physician. McArdle then continued to treat plaintiff until he saw the orthopedic surgeon in December 2017, providing plaintiff with capsaicin cream and Voltaren gel in addition to Ibuprofen and issuing him a recreation restriction. Although plaintiff says that McArdle was aware that he needed surgery in August 2017 and forgot to have it scheduled, he fails to present any evidence in support of his contention. In addition, the undisputed facts show that surgery was not recommended until December 2017.

In his complaint, plaintiff alleged that defendant McArdle ignored his complaints of pain following his visit with the orthopedic specialist in December 2017 and failed to schedule his surgery for almost two months after it was approved in January 2018. However,

plaintiff did not raise these issues in his summary judgment materials, and the undisputed facts do not support these claims.

(Although plaintiff had been prescribed Tramadol in December 2017, it was discontinued in January 2018 because he was not using it appropriately.) On January 24, McArdle noted that plaintiff was using acetaminophen, NSAIDs, capsaicin cream and Voltaren gel for pain. She explained to plaintiff that the state cautioned against using narcotic medications for chronic musculoskeletal pain and offered him a different NSAID coupled with diphenhydramine. Although plaintiff complained about pain again six days later, McArdle stated that plaintiff had to give the new NSAID and diphenhydramine a chance to work. She also provided plaintiff ice to help his pain. Although plaintiff had to wait at least two months to have his surgery, there is no evidence that McArdle was responsible for the delay. In fact, it is undisputed that a three-month wait for surgery requiring both surgeon and hospital availability is consistent with community standards.

On March 11, plaintiff submitted two health service requests stating that he had received oxycontin during surgery and that he needed more for pain. McArdle responded that the surgeon did *not* want plaintiff to have any controlled medications and told plaintiff that he did not have to take the Tramadol if he did not want to. On March 16, McArdle added acetaminophen. Plaintiff submitted a health service request on March 18, stating that he was in severe pain. However, he saw Dr. Patterson, who ordered additional crushed Tramadol until plaintiff had his follow-up appointment with Dr. Riley on March 23.

On March 24, 26 and 27, 2018, plaintiff submitted multiple health service requests

demanding another imaging study for his right knee, alleging that Dr. Riley "messed up" during surgery and that he was in extreme pain.  Defendant McArdle responded that plaintiff could discuss his concerns with Dr. Riley at his upcoming appointment and that plaintiff could see Dr. Patterson for knee pain.  On March 28, Dr. Patterson noted that the wound looked good and ordered ice, elevation, no strenuous activity and Ibuprofen and Tylenol for pain.  Plaintiff has failed to point to any evidence showing that McArdle knew that the decisions of Dr. Riley and Dr. Patterson regarding plaintiff's treatment would pose plaintiff an excessive risk of harm by unnecessarily prolonging his pain or exacerbating his injury.

In sum, based on the evidence in the record, no reasonable jury could conclude that McArdle acted with deliberate indifference to plaintiff's serious medical needs.  Therefore, defendant McArdle is entitled to summary judgment with respect to plaintiff's claim against her.

## G.  Defendant Waterman

Plaintiff alleged in his complaint that defendant Waterman, the health services manager at the Wisconsin Secure Program Facility, ignored his complaints of pain following his visit with Dr. Riley in December 2017, and failed to insure that he received a response to health services requests that he submitted about being in pain between March 9, 2018 and March 21, 2018.  However, plaintiff has failed to produce any evidence showing that Waterman saw the health service requests or knew about his complaints of pain, or that she had any other personal involvement in his treatment or care.  As discussed above, defendant

McArdle treated plaintiff and responded to his health service requests during both of these periods, and plaintiff has failed to show that she acted with deliberate indifference in doing so. Further, even though Waterman held an administrative and supervisory role in the health services unit, plaintiff cannot hold her vicariously liable for McArdle's actions or insist that she perform the jobs of others. Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("[N]o prisoner is entitled to insist that one employee do another's job"). Accordingly, no reasonable jury could conclude that Waterman acted with deliberate indifference to plaintiff's serious medical needs. She is entitled to summary judgment with respect to plaintiff's claim against her.

ORDER

IT IS ORDERED that

1. Plaintiff Jeff Poff's motion to dismiss the motions for summary judgment filed by defendants Tim Deters and Sandra McArdle, dkt. #174, is DENIED.

2. Plaintiff's motion for clarification, dkt. #180, is GRANTED.

3. The motion filed by state defendants Candace Warner, Angelica Rowin Fox, Trisha Anderson, Laura Wood, Denise Valerius, Jamie Gohde, Jesse Beaver, Salem Syed and Jolinda Waterman to supplement the summary judgment record with defendant Valerius's declaration, dkt. #188, is GRANTED.

4. Defendant Deters's motion for summary judgment for plaintiff's failure to exhaust his administrative remedies, dkt. #100, is DENIED.

5. Plaintiff's motion for summary judgment, dkt. #107, is DENIED.

6. Defendants' motions for summary judgment as to the merits of plaintiff's claims, dkt. ##136, 141, 146 and 151, are GRANTED.

7. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 29th day of January, 2020.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge